**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TENILE DAVIS** | : | Case No.: 1:20-cv-00002 |
| 7292 Fenway Circle | : | |
| Reynoldsburg, OH 43068 | : | Judge: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **RCO LIMITED** | : | |
| 1062 Ridge Street | : | **COMPLAINT WITH JURY** |
| Columbus, OH 43215 | : | **DEMAND ENDORSED HEREON** |
| | : | |
| <u>Also Serve its Statutory Agent:</u> | : | |
| Brian E. Linhart | : | |
| 52 E. Gay Street | : | |
| Columbus, OH 43215 | : | |
| | : | |
| Defendant. | : | |
| | : | |

## **PARTIES**

1. Plaintiff Tenile Davis ("Ms. Davis" or "Plaintiff") is a citizen and resident of the state of Ohio.

2. Defendant RCO Limited ("RCO") is an Ohio limited liability company that owns and operates approximately thirty-five Raising Cane's Chicken Fingers Franchises throughout Ohio and Kentucky.

3. RCO is an employer as that term is defined by Ohio and federal law.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over Counts I, III and V pursuant to 28 U.S.C. § 1331 because these Counts arise under the federal Fair Labor Standards Act and Title VII of the Civil Rights Act.

5. This Court has supplemental jurisdiction over the state law claims in Counts II, IV and VI pursuant to 28 U.S.C. § 1367 on the grounds that these Counts are so related to the federal claims over which this Court has original jurisdiction that they form the same case or controversy.

6. This Court has personal jurisdiction over RCO because its principal place of business is within this district and division.

7. Venue is proper in this district and division pursuant to 29 U.S.C. § 1391(b). Ms. Davis was employed within this district and division, and the conduct giving rise to her claims occurred within this district and division.

**FACTUAL BACKGROUND**

8. RCO is the nation's largest franchisee of Raising Cane's chicken finger franchises. It employs over 1500 people and owns and operates more than 35 restaurants throughout Ohio and Northern Kentucky, with most of the restaurants located in the Greater Columbus and Greater Cincinnati regional markets.

9. Ms. Davis is an African American female. She worked for RCO for more than thirteen years, beginning in 2003.

10. Ms. Davis worked her way up through the ranks at RCO, starting as an hourly cashier and cook. By 2010, she was the General Manager of one of RCO's Columbus restaurants. By 2013 she earned a promotion to Area Director. By 2015, Ms. Davis held the position of Vice President and had a seat on RCO's senior leadership team.

11. Throughout her employment with RCO, including in each of her executive roles, Ms. Davis was an outstanding performer who consistently delivered excellent results.

12. Eric Ongaro became RCO's President in early 2017. At this time, RCO's senior leadership team consisted of Mr. Ongaro, Brian Settle–Vice President of Business Support, Brian Gunnoe–Vice President of Development, Jeff Shermer–Vice President of Operations for the Cincinnati market with overall responsibility for marketing, and Ms. Davis, who was then Vice President of Operations for the Columbus market with responsibility for training. With the exception of Ms. Davis, all of the members of RCO's senior leadership team are white males.

13. Under Mr. Ongaro's leadership, RCO has engaged in a pattern and practice of race and gender discrimination and retaliation against anyone who might oppose it. Multiple RCO employees have described Mr. Ongaro as having created not a just a boys club, but a "white boys club" among RCO leadership that excluded Ms. Davis.

14. In approximately July 2017, Mr. Ongaro reorganized Mr. Shermer's and Ms. Davis's functional responsibilities by making Mr. Shermer the Vice President of Operations for all markets and Ms. Davis the Vice President of Restaurant Support, with overall responsibility for training and marketing. Although she did not openly oppose it at the time, Ms. Davis found this change to her and Mr. Shermer's relative duties curious because she was a superior performer to Mr. Shermer from an operations standpoint.

15. In the months that followed, Mr. Ongaro took a series of actions to undermine Ms. Davis and strip her of her marketing responsibilities so that he could give them to Matt Salts, a white male with no restaurant experience who was then unemployed.

16. Further, although Ms. Davis was a superior performer to Mr. Shermer, who was her counterpart on the senior leadership team, Mr. Ongaro treated Mr. Shermer substantially better

than he did Ms. Davis. Among other things, Mr. Ongaro looked past Mr. Shermer's significant performance shortcomings and attempted to hold Ms. Davis responsible for them.

17. Under Mr. Ongaro's leadership, multiple employees have complained about racially discriminatory and harassing conduct by members of management. Instead of taking steps to remedy this discriminatory conduct, or discipline or terminate the perpetrators of it, RCO retaliates against those who complain by marginalizing them, launching baseless investigations against them and/or firing them.

18. In approximately April of 2018, a long-tenured and successful African American female employee complained to RCO's Human Resources Manager that Mr. Salts had engaged in racially harassing conduct towards her. Following this complaint, Mr. Ongaro and Mr. Salts issued her unjustified discipline, diminished her responsibilities, isolated her from leadership and ultimately fired her.

19. On multiple occasions, in 2018, Ms. Davis told Mr. Ongaro that RCO had a significant diversity problem, and that African Americans were dramatically underrepresented in its management.

20. In the fall of 2018, Ms. Davis presented information about RCO's diversity problem to one of its owners, Timothy McCarthy. Among other things, she shared with him materials reflecting that RCO had hired approximately 150 managers between the end of 2016 and the end of 2018, but few, if any of them were African American.

21. In early December of 2018, Ms. Davis brought this same information to Mr. Ongaro's attention. Mr. Ongaro stated that this was "interesting" and that he would discuss this with Human Resources and have them "start reporting out quarterly." On information and belief,

neither Mr. McCarthy, nor Mr. Ongaro, nor anyone else at RCO has taken any action to address this problem.

22. In the fall of 2018, Jason Britton, an African American Marketing Advisor who was one of Ms. Davis's direct reports, complained to Ms. Davis about the way he was being treated by Scott Brandenburg, a General Manager of RCO's Florence, Kentucky restaurant – particularly that Mr. Brandenburg was discriminating against him on the basis of his race. Mr. Brandenburg had a history of racially discriminatory and harassing conduct of which RCO's Human Resources Manager was well aware.

23. Ms. Davis was concerned that if she brought these complaints to Mr. Ongaro, he would either ignore them or retaliate against Mr. Britton, so she brought them to the attention of Mr. McCarthy. After hearing what Ms. Davis described about Mr. Britton's complaints, Mr. McCarthy asked if she thought Mr. Britton would be willing to talk to him directly. Ms. Davis stated that she thought he would, and Mr. McCarthy told her to arrange a time with his administrative assistant.

24. Following this conversation, Ms. Davis called Mr. McCarthy's administrative assistant to schedule time on Mr. McCarthy's calendar for Mr. Britton to speak with him. Apparently, Mr. McCarthy had changed his mind following his conversation with Ms. Davis, because his secretary told her that Mr. McCarthy wanted Mr. Ongaro to have an opportunity to address these issues, and that Mr. Britton needed to take his complaints to Mr. Ongaro.

25. Following these instructions, Ms. Davis told Mr. Britton that he needed to contact Mr. Ongaro directly about his race discrimination complaints. On November 29, 2018, Mr. Britton sent an email to Mr. Ongaro indicating that he had spoken to Ms. Davis and, at her suggestion, wanted to set up some time to speak with him about "some concerns" that he had. Mr. Ongaro

then asked Ms. Davis what concerns Mr. Britton wanted to discuss. She informed Mr. Ongaro that Mr. Britton's concerns were about race discrimination that he experienced at RCO, particularly on the part of Mr. Brandenburg. Mr. Ongaro was visibly irritated by this.

26. On the evening of November 30, 2018 Mr. Ongaro called Ms. Davis to discuss Mr. Britton. Rather than show an interest in the nature of his complaints, however, Mr. Ongaro began describing a series of performance concerns about Mr. Britton. Ms. Davis pointed out to Mr. Ongaro that at least some of what he was saying about Mr. Britton was not correct, but Mr. Ongaro would hear none of it and suggested that her decision to hire Mr. Britton was a mistake. He asked her whether she would still hire Mr. Britton if she had to do it over again. Ms. Davis responded that she still would have hired him, but she would have him do his training at a restaurant other than Mr. Brandenburg's. Mr. Ongaro disregarded this and directed Ms. Davis to take the weekend and decide what she needed to do about Mr. Britton. Lest there be any doubt about what Mr. Ongaro expected, he closed the conversation by telling her that if she came to the wrong solution, it would cause him to question her judgment and he would make what he viewed to be the best decision anyway.

27. On or about Monday, December 3, 2018, Mr. Ongaro asked Ms. Davis what she was going to do about Mr. Britton. Per Mr. Ongaro's earlier threat, Ms. Davis knew that if she refused to support terminating Mr. Britton, she might be fired herself. She responded that she did not want to terminate Mr. Britton, but she acknowledged that it was clear to her that, because of the way certain people are treating him, he had no real chance to be successful, regardless of how well he performed. Mr. Ongaro then instructed her to offer Mr. Britton a small amount of severance in exchange for a release of legal claims.

28. Between approximately December 3, 2018 and December 13, 2018, Mr. Britton was on medical leave.

29. On December 13, 2018, Mr. Britton sent Mr. Ongaro an email in which he identified some of the discriminatory treatment that he had endured at the hands of Mr. Brandenburg. Among other things, Mr. Britton detailed racist and harassing comments that Mr. Brandenburg had made towards him or in his presence. He further explained that Mr. Brandenburg refused to participate in his training and, following his training, went out of his way to interfere with Mr. Britton's ability to do his job. Instead, Mr. Brandenburg's interactions with Mr. Britton involved only Mr. Brandenburg speaking down to him and belittling him. Finally, Mr. Britton made it clear that Ms. Davis had encouraged him to complain about Mr. Brandenburg's discriminatory conduct.

30. That same day, Mr. Ongaro forwarded Mr. Britton's email to Ms. Davis, Mr. Shermer and Mr. Settle and expressed his disapproval of the conduct Mr. Britton alleged, with the caveat "[i]f these claims are true." In the very same email, he wrote, "Completely separate from this, I am incredibly frustrated at the amount of time I have spent dealing with Jason Britton . . . I am pretty fed up here."

31. The next day, December 14, 2018, Mr. Ongaro met with Mr. Shermer, Mr. Settle and Ms. Davis to discuss Mr. Britton's email. No one in the room seemed to doubt the veracity of Mr. Britton's complaints about Mr. Brandenburg. Rather, Mr. Ongaro attempted to minimize Mr. Brandenburg's conduct by stating: "Well, it's Kentucky" (or similar words to that same effect).

32. In the days that followed, Mr. Taylor conducted a limited investigation of Mr. Britton's complaint. In a meeting following the conclusion of this investigation, Mr. Settle said he thought Mr. Brandenburg should be stripped of his Managing Partner title and training

7

restaurant status, and be suspended without pay for an extended period. Mr. Ongaro and Mr. Shermer disagreed. Mr. Ongaro was intent on sweeping Mr. Brandenburg's conduct, and Mr. Britton's complaints, under the rug. He decreed that he did not want any public punishment for Mr. Brandenburg. Rather, he determined that Mr. Brandenburg should be suspended for a period of one week and made to go to some form of training. On information and belief, this discipline was never carried out; or, if it was, it was only *after* RCO received a letter from Mr. Britton's counsel threatening legal action some six weeks later.

33. In spite of the difficult environment that existed at RCO, Ms. Davis nevertheless delivered excellent performance in 2018, just as she had in years prior. In her end-of-year review meeting with Mr. Ongaro in December of 2018, he praised her performance and indicated that she had a great year. He could hardly do otherwise, as she had met all of the eighteen goals that he had established for her during the prior year. Other than her outstanding performance, Mr. Ongaro and Ms. Davis discussed Ms. Davis's goals for 2019 and her career ambitions. Among other things, Ms. Davis again indicated her desire to improve diversity at RCO. Mr. Ongaro ignored this, and the performance review meeting closed with Mr. Ongaro expressing that he was looking forward to Ms. Davis having a great 2019.

34. Following Mr. Britton's complaint, Ms. Davis and Mr. Taylor had a conversation with RCO's legal counsel. After this call, Mr. Taylor prepared a letter offering Mr. Britton the opportunity to resign with a small severance. Ms. Davis understood that if Mr. Britton did not agree to resign, RCO would not terminate him, but instead place him on a performance improvement plan, which she had prepared.

35. Mr. Taylor scheduled a meeting with Mr. Britton on January 7, the subject of which was supposed to be the results of his investigation into Mr. Britton's allegations of race

8

discrimination and harassment by Scott Brandenburg. Mr. Taylor, however, never actually intended to discuss Mr. Britton's allegations. Rather, he was operating on instructions to make sure Mr. Britton never returned to work at RCO.

36. On the morning of January 7, 2019, Mr. Taylor presented Ms. Davis the letter he had prepared offering Mr. Britton the opportunity to resign. Ms. Davis objected, and told him that she was not comfortable signing it. Mr. Taylor insisted that she had to sign it, and if she refused, he would tell Mr. Ongaro, and Mr. Ongaro would be very unhappy. Ms. Davis, who has three young children and was the primary income earner in her family, couldn't afford to be fired, so she relented and signed the letter. Mr. Taylor also told Ms. Davis that she was not to mention anything to Mr. Britton about the performance improvement plan until after he declined the severance. When Ms. Davis asked why, Mr. Taylor explained that "they" (meaning RCO's leadership) did not want Mr. Britton to continue working at RCO and were afraid that he might actually accept the performance improvement plan.

37. Mr. Taylor met with Mr. Britton later that morning. Although Ms. Davis was present for the meeting, she did not otherwise participate. Mr. Taylor presented the severance offer to Mr. Britton, which included a release agreement, and provided him with 21 days to consider the offer. Mr. Taylor did not mention anything to Mr. Britton about the possibility of a performance improvement plan if he did not accept the severance offer. Rather, he only explained that certain of Mr. Britton's work relationships had become too toxic for his employment to continue successfully, and emphasized that he had 21 days to consider the offer.

38. Following this meeting, Ms. Davis had separate conversations with both Mr. Ongaro and Mr. Settle in which she explained that Mr. Taylor did not offer Mr. Britton the performance improvement plan, but instead only offered the severance in exchange for his

9

resignation. Both Mr. Ongaro and Mr. Settle made it clear to her that they had no issue with Mr. Taylor not offering the performance improvement plan.

39. On the morning of January 28, 2019, Ms. Davis asked Mr. Taylor if he had heard from Mr. Britton about the severance offer. Mr. Taylor stated that Mr. Britton had called him a few days prior, while RCO management was on a company trip in the Dominican Republic, and asked what would happen if he did not agree to resign. Mr. Taylor told Ms. Davis that he explained to Mr. Britton that he would most likely be terminated. Ms. Davis asked Mr. Taylor why he did not tell Mr. Britton about the option to return to work on a performance improvement plan, and Mr. Taylor responded that he was specifically instructed that Mr. Britton was not to return to RCO, and that the problem with offering Mr. Britton the performance improvement plan was that he might actually take it and come back to work. Immediately after this conversation, Ms. Davis called Mr. Ongaro to express her concerns about what Mr. Taylor had just told her. Mr. Ongaro did not answer, so she left a voicemail. Mr. Ongaro did not return her call or otherwise respond.

40. The next day, on January 29, 2019, Mr. Ongaro summoned Ms. Davis to his office for a meeting with him and Mr. Taylor. Mr. Ongaro had received a letter from Mr. Britton's attorney alleging race discrimination, and identifying specific discriminatory conduct. Mr. Ongaro then proceeded to ask Ms. Davis for information to oppose Mr. Britton's allegations and to identify performance deficiencies that might justify RCO's decision to fire him. While Ms. Davis provided Mr. Ongaro with some information that, at least in part, rebutted some of Mr. Britton's allegations, she expressed that other allegations were substantiated. Further, when Mr. Ongaro attempted to articulate three separate justifications for firing Mr. Britton, Ms. Davis responded by providing him with facts and reasoning undercutting each one of them, and thus opposing Mr. Ongaro's narrative. Mr. Ongaro grew frustrated that Ms. Davis would not tell him what he wanted to hear

and pointedly explained to her what he must have felt she failed to understand – that he was trying to build a counter to Mr. Britton's case. Mr. Ongaro then abruptly told Ms. Davis that he was removing her from her position as Vice President of Training, effective immediately.

41. Mr. Ongaro then offered Ms. Davis a position that he knew would be impossible for her to accept – the Cincinnati Market Training Advisor position from which Mr. Britton had been fired. He told her if she accepted the position, she would need to spend a substantial majority of her time in Cincinnati. As Mr. Ongaro knew, Ms. Davis lived in Columbus with her husband, who was then a student at Ohio State, and her three small children. Further, the position represented a demotion of at least two levels in the organization, involved a massive pay cut, and would have her working directly with Mr. Brandenburg, whom both she and Mr. Ongaro knew to be a racist. Mr. Ongaro could hardly have been clearer, he had just fired Ms. Davis.

42. Days later, Mr. Ongaro sent an email to all members of RCO management announcing Ms. Davis's termination. In it, he explained that Ms. Davis's role was eliminated as part of a "restructuring."

43. Ms. Davis was at least the third African American employee that RCO fired from its restaurant support organization since Mr. Ongaro took over as its President. RCO terminated at least two additional African American employees from its restaurant support organization after it fired Ms. Davis.

44. On information and belief, each of these terminated employees has something else in common – each of them complained about and/or opposed race discrimination at RCO before it fired them.

## COUNT I

**(Race Discrimination in Violation of Title VII of the Civil Rights Act)**

45. Ms. Davis realleges the foregoing paragraphs as if fully rewritten herein.

46. Ms. Davis is African American.

47. Ms. Davis was qualified for her position at all relevant times.

48. RCO treated Ms. Davis substantially worse than similarly situated Caucasian employees, including her fellow Vice Presidents and Mr. Salts.

49. RCO then discharged Ms. Davis based upon her race in violation of Title VII of the Civil Rights Act.

50. RCO's termination of Ms. Davis permitted the hiring and/or retention of Caucasian employees.

51. RCO engages in a pattern and practice of race discrimination.

52. RCO's actions were intentional, willful, wanton, and malicious in nature.

53. As a direct and proximate result of RCO's unlawful discriminatory conduct, Ms. Davis has suffered injury and damages for which she is entitled to recovery under Title VII of the Civil Rights Act.

## COUNT II

**(Race Discrimination in Violation of O.R.C. Chapter 4112)**

54. Ms. Davis realleges the foregoing paragraphs as if fully rewritten herein.

55. Ms. Davis is African American.

56. Ms. Davis was qualified for her position at all relevant times.

57. RCO treated Ms. Davis substantially worse than similarly situated Caucasian employees, including her fellow Vice Presidents and Mr. Salts.

58. RCO then discharged Ms. Davis based upon her race in violation of Chapter 4112 of the Ohio Revised Code.

59. RCO's termination of Ms. Davis permitted the hiring and/or retention of Caucasian employees.

60. RCO engages in a pattern and practice of race discrimination.

61. RCO's actions were intentional, willful, wanton, and malicious in nature.

62. As a direct and proximate result of RCO's unlawful discriminatory conduct, Ms. Davis has suffered injury and damages for which she is entitled to recovery under Chapter 4112 of the Ohio Revised Code.

## COUNT III

**(Unlawful Retaliation in Violation of Title VII of the Civil Rights Act)**

63. Ms. Davis realleges the foregoing paragraphs as if fully rewritten herein.

64. Ms. Davis engaged in protected activity by complaining about, encouraging others to complain about, and otherwise opposing race discrimination at RCO.

65. RCO's management took no meaningful action to address these complaints. Instead, RCO engaged in a pattern of retaliation that included firing Ms. Davis for engaging in protected activity.

66. RCO's actions were willful, wanton, malicious, and/or in reckless disregard of Ms. Davis's rights.

67. As a direct and proximate result of RCO's unlawful retaliatory conduct, Ms. Davis has suffered injury and damages for which she is entitled to recovery under Title VII of the Civil Rights Act.

## COUNT IV

**(Unlawful Retaliation in Violation of O.R.C. Chapter 4112)**

68. Ms. Davis realleges the foregoing paragraphs as if fully rewritten herein.

69. Ms. Davis engaged in protected activity by complaining about, encouraging others to complain about, and otherwise opposing race discrimination at RCO.

70. RCO's management took no meaningful action to address these complaints. Instead, RCO engaged in a pattern of retaliation that included firing Ms. Davis for engaging in protected activity.

71. RCO's actions were willful, wanton, malicious, and/or in reckless disregard of Ms. Davis's rights.

72. As a direct and proximate result of RCO's unlawful retaliatory conduct, Ms. Davis has suffered injury and damages for which she is entitled to recovery under Chapter 4112 of the Ohio Revised Code.

## COUNT V

**(Gender Discrimination in Violation of Title VII of the Civil Rights Act)**

73. Ms. Davis realleges the foregoing paragraphs as if fully rewritten herein.

74. Ms. Davis is a female.

75. Ms. Davis was qualified for her position at all relevant times.

76. RCO treated Ms. Davis substantially worse than similarly situated male employees, including her fellow Vice Presidents and Mr. Salts.

77. RCO then discharged Ms. Davis based upon her gender in violation of Title VII of the Civil Rights Act.

78. RCO engages in a pattern and practice of gender discrimination.

79. RCO's actions were intentional, willful, wanton, and malicious in nature.

80. As a direct and proximate result of RCO's unlawful discriminatory conduct, Ms. Davis has suffered injury and damages for which she is entitled to recovery under Title VII of the Civil Rights Act.

## **COUNT VI**

### **(Gender Discrimination in Violation of O.R.C. Chapter 4112)**

81. Ms. Davis realleges the foregoing paragraphs as if fully rewritten herein.

82. Ms. Davis is a female.

83. Ms. Davis was qualified for her position at all relevant times.

84. RCO treated Ms. Davis substantially worse than similarly situated male employees, including her fellow Vice Presidents and Mr. Salts.

85. RCO then discharged Ms. Davis based upon her gender in violation of Chapter 4112 of the Ohio Revised Code.

86. RCO engages in a pattern and practice of gender discrimination.

87. RCO's actions were intentional, willful, wanton, and malicious in nature.

88. As a direct and proximate result of RCO's unlawful discriminatory conduct, Ms. Davis has suffered injury and damages for which she is entitled to recovery under Chapter 4112 of the Ohio Revised Code.

**WHEREFORE**, Plaintiff Tenile Davis demands judgment against Defendant RCO Limited as follows:

(a) That Defendant be enjoined from further unlawful conduct as described in the Complaint;

(b) That Plaintiff be awarded compensatory damages including emotional distress

damages;

(c) That Plaintiff be awarded all lost pay and benefits;

(d) That Plaintiff be awarded punitive damages;

(g) That Plaintiff be awarded pre-judgment interest;

(h) That Plaintiff be awarded reasonable attorneys' fees; and

(i) That Plaintiff be awarded all other legal and equitable relief to which she may be entitled.

## JURY DEMAND

Plaintiff Tenile Davis hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Theodore C. Copetas
Theodore C. Copetas (0068419)
Eberly McMahon Copetas LLC
2321 Kemper Lane, Suite 100
Cincinnati, OH  45206
513-533-9898
513-533-3554 Fax
tcopetas@emclawyers.com

Counsel for Plaintiff Tenile Davis